IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTINA DANIELLE MIRACLE-ADAMS,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

Case No. 3:17-cv-00672-SB

**OPINION AND ORDER**

**BECKERMAN, Magistrate Judge.**

      Christina Miracle-Adams ("Plaintiff") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the review provisions of 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

## BACKGROUND

Plaintiff was born in March 1977, making her thirty-five years old on January 30, 2013, the day she filed her protective application.[1] (Tr. 30, 110.) Plaintiff has "at least a high school education" and no past relevant work. (Tr. 30.) In her application, Plaintiff alleged disability due to lupus, arthritis in her spine, hips, knees, and hands, nerve and back pain, and kidney problems. (Tr. 110.)

On June 28, 2012, roughly six months before the protective filing date, Plaintiff visited Ineke Glavor ("Glavor"), a certified physician's assistant at Gladstone Primary Care. Plaintiff complained primarily about lower back pain. Glavor noted that Plaintiff "tested positive for cannabis prior to her app[ointment] with pain management," that Plaintiff received a copy of Glavor's office's "pain policy" and understood that Glavor was "unable to give her opioids," that Plaintiff "decline[d]" Glavor's offer to participate in physical therapy, and that Plaintiff was "unhappy that she will not be able to received opioids" from Gladstone Primary Care. (Tr. 881-82.)

On March 15, 2013, Plaintiff visited Dr. Yen Nguyen ("Dr. Nguyen"), a doctor of osteopathic medicine at Kaiser Permanente. Plaintiff complained primarily about lower back pain that radiates down her legs, "esp[ecially] on the [right] side." (Tr. 903.) Plaintiff reported that her pain worsened in recent months after she "missed 2 steps while getting out of [a] trailer" and lifted a twenty-five pound bag of potatoes "around Thanksgiving." (Tr. 903.) Plaintiff also reported that Dilaudid, Vicodin, Percocet, and fentanyl patches had "worked well" in the past, and that Tylenol, Naproxen, ibuprofen, steroid injections, oral steroids, and physical therapy

---

[1] "[T]he earliest an SSI claimant can obtain benefits is the month after which he filed his application[.]" *Schiller v. Colvin*, No. 12-771–AA, 2013 WL 3874044, at *1 n.1 (D. Or. July 23, 2013) (citation omitted).

were not effective in treating her pain and/or caused unpleasant side effects. (Tr. 903.) Dr. Nguyen noted that Plaintiff exhibited full strength in her upper and lower extremities, that Plaintiff was "[a]ble to walk on tiptoes and heels but very slow," that straight leg tests were negative, that Plaintiff "refuse[d] to extend her back due to pain," but her range of motion was "otherwise full," and that Plaintiff "want[ed] some pain medication." (Tr. 904.) Dr. Nguyen prescribed Meloxicam and Vicodin, but advised Plaintiff to use only Vicodin to treat severe pain. (Tr. 904.)

On March 19, 2013, Plaintiff established care with Dr. Timothy Lan ("Dr. Lan"), a medical doctor at Kaiser Permanente. Plaintiff reported that she had a history of lupus and Crohn's disease, she suffers from lower back pain and "[g]ets shocks when she runs or walks," she did not "want to be on narcotics again" because they "were nasty," and she "does yoga." (Tr. 908-09.) Dr. Lan noted that Plaintiff "has normal strength and reflexes," an MRI of Plaintiff's thoracic and lumbar spine revealed "nothing more than mild disc issues and degenerative changes," Plaintiff "possibly has a psychosomatic component to her discomfort," the etiology of Plaintiff's lower back pain and muscle spasms was "unclear," Plaintiff "likely does experience chronic, recurrent muscle strain/spasms leading to her back discomfort," and Plaintiff's joint aches and right hip discomfort "may be related" to her history of lupus and being obese. (Tr. 910-11.)

Plaintiff returned to Kaiser Permanente on March 29, 2013, complaining about pain in her left "hip area." (Tr. 913.) Dr. Christopher Calawa ("Calawa") noted that "no labs" confirmed Plaintiff's reported diagnosis of lupus, Plaintiff reportedly injured her hip "getting out of a bus" and walking "into a door handle at home," Meloxicam and hydrocodone provided only "marginal relief," Plaintiff reportedly "tolerated" Dilaudid and Percocet in the past, and Plaintiff

felt that she needed a "stronger" pain medication. (Tr. 913.) Dr. Calawa prescribed Plaintiff Dilaudid to treat her pain, ordered lab tests, and provided a referral to physical therapy. (Tr. 914-15.)

On April 7, 2013, Plaintiff visited Michael Hibbs ("Hibbs"), a physician's assistant at Kaiser Permanente. Plaintiff complained about "right hip and groin pain after she apparently misstepped off a small step stool earlier today," and she requested "more pain medication." (Tr. 918.) Hibbs noted that x-rays of Plaintiff's pelvis and right hip showed "no bony abnormalities," and she was "able to do a straight leg raise." (Tr. 918.) Hibbs also stated: "I gave her a small prescription for more Dilaudid, but she does need to follow up with her primary care doctor. Given the fact that she is new to our system, she has already received several narcotic medications. I would be somewhat cognizant of the fact that she might be a narcotic seeker in the future." (Tr. 918.)

On June 27, 2013, Plaintiff presented for a follow-up visit with Dr. Richard Varan ("Dr. Varan"), a medical doctor at Kaiser Permanente, regarding a recent injury to her "right shoulder and right chest wall area." (Tr. 992.) Plaintiff reportedly suffered the injury while attempting "to move an entertainment center at her home." (Tr. 992.) Dr. Varan noted that Plaintiff's x-rays were negative and her pulmonary exams were normal, that the reported "intensity" of Plaintiff's "pain is striking and difficult to explain," that Plaintiff "has demonstrated both unexpectedly intense pain from soft tissue injuries in the past as well as a strikingly poor response to strong narcotics," that Dr. Varan "agree[d] to even stronger use of Dilaudid at this time since [Plaintiff was] reporting incapacitating pain and ha[d] tolerated even more aggressive use of narcotics in the past," and that Plaintiff is "demonstrating a pattern that would make her a bad candidate for long-term chronic [narcotic] use and in fact she has tried this in the past for other pain issues

without great benefit and [Plaintiff agreed] that we do not want to use narcotic long-term." (Tr. 992.)

In a treatment note dated August 8, 2013, Dr. Peggy Eurman ("Dr. Eurman"), a medical doctor at Kaiser Permanente, stated that she was "concerned" that Plaintiff's "complaints" are not consistent with "findings on exam," and that she "must consider drug seeking behavior[.]" (Tr. 1003.)

On September 5, 2013, Plaintiff visited Dr. Christina Lee ("Dr. Lee"), a medical doctor at Kaiser Permanente, complaining of left ankle and foot pain that "began 2 years ago when she injured her ankle." (Tr. 1016-17.) Plaintiff reported that her lupus had "been under good control" and that there was "no sign of active disease currently." (Tr. 1016.) Plaintiff added that "she has a history of chronic low back pain which waxes and wanes," but had "been fairly stable." (Tr. 1016.) Dr. Lee referred Plaintiff to a podiatrist and recommended that she increase her dose of gabapentin.

On October 15, 2013, Plaintiff visited Dr. Gary Martel ("Dr. Martel"), a dentist at Kaiser Permanente, complaining of temporomandibular joint pain. Dr. Martel diagnosed Plaintiff with "[c]hronic and severe" temporomandibular "derangement" and a "[p]robable disc disorder." (Tr. 1033.)

On October 18, 2013, Plaintiff visited Dr. Eurman and reported that on October 9, 2013, "she walking into [a] playhouse after yard work and hit the top of her head on a low door frame and hyperextended her neck." (Tr. 1035.) Dr. Eurman provided Plaintiff with Vicodin, discussed physical therapy, and noted that she would consider an MRI if Plaintiff's symptoms worsened. (Tr. 1035.)

On October 29, 2013, Plaintiff visited Dr. Varan and reported that "she fell in the shower about a week ago and since then she has had very intense left-sided neck pain[.]" (Tr. 1049.) Dr. Varan noted that Plaintiff's examination "seemed pretty reassuring but she had significant limitation of range of motion testing from pain," and that the reported intensity of Plaintiff "pain is striking and conspicuous." (Tr. 1049.) Dr. Varan also stated that Plaintiff's "current neck pain episode is in many respects similar to past episodes" of intense pain in "the aftermath of relatively modest injuries," he does not believe that Plaintiff is "a malingering or drug-seeking patient," but he does believe Plaintiff "suffers from some sort of centrally mediated neuropathic syndrome that intensifies pain in the aftermath of injury," "[i]n general, imaging has not identified significant local pathology," and the podiatry department also "seem[ed]" to believe Plaintiff's left foot pain is related to "centrally mediated pain and a neuropathic syndrome[.]" (Tr. 1050.)

On November 18, 2013, Plaintiff visited Dr. Gary Martel ("Dr. Martel"), a doctor of dentistry surgery, complaining of "moderate to severe" temporomandibular joint pain. (Tr. 1717.) Dr. Martel refilled a prescription for Soma, advised Plaintiff to ice, set up an oral surgery consultation "in one week," and told Plaintiff that it was "important" to "keep this appointment." (Tr. 1717.)

In an Emergency Department note dated November 21, 2013, Dr. Mary Eschbach ("Dr. Eschbach"), an emergency room doctor at Kaiser, noted that she reviewed Plaintiff's prescription history on the Oregon Prescription Drug Monitoring Program ("OPDMP") portal and it showed "at least 586 tablets of narcotic pain pills alone (not including sedatives, etc.) since 1/13." (Tr. 1721.) Dr. Eschbach also noted "[m]ultiple providers" had "raised question[s]" about Plaintiff's "excessive use of narcotics," that Plaintiff reported suffering from Crohn's disease and lupus, but

her records revealed that Kaiser specialists were not able to confirm these diagnoses, that Plaintiff's mandible "reduce[d] spontaneously without manipulation" when "she relaxed," and that Plaintiff and her husband "stormed out" of the emergency room "swearing" when Dr. Eschbach stated that Plaintiff's preliminary urine drug screen showed signs of THC. (Tr. 1721-22; *see also* Tr. 1726, indicating that Plaintiff spoke with Dr. Varan on November 27, 2013, reported that she "had a medical marijuana card for a long time" and "finds marijuana helpful for pain," and agreed to "stop using marijuana" after Dr. Varan informed Plaintiff that "DEA regulations specify [that] patients prescribed controlled substances such as narcotics should not use illegal drugs such as marijuana even in states with regulations permitting marijuana for medical use").

On November 27, 2013, Dr. William Backlund ("Dr. Backlund"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 116-18.) Based on his review of the record, Dr. Backlund concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk about six hours in an eight-hour workday; push and pull in accordance with her lifting and carrying restrictions; frequently balance and stoop; and occasionally crawl, crouch, kneel, and climb. Dr. Backlund also found that Plaintiff does not suffer from manipulative, visual, communicative, or environmental limitations.

On January 3, 2014, Dr. Varan informed Plaintiff that she was "overdue for a repeat of her urine drug screen." (Tr. 1728.)

On January 29, 2014, Plaintiff visited the Providence Portland Medical Center Emergency Department, complaining of jaw pain and dislocation. Plaintiff reported that "she has chronic, recurrent dislocations for the past 17 years after a traumatic injury," her jaw dislocates

"about every 2 months," and "[t]onight she was yelling at her daughter when it occurred." (Tr. 1147.) Dr. Heather Prouty ("Dr. Prouty") noted that Plaintiff "underwent deep sedation" and she "was able to easily reduce the jaw," and Plaintiff was prescribed a narcotic pain medication. (Tr. 1148-49.)

On February 3, 2014, Dr. Varan and Plaintiff discussed the fact that she "must choose between marijuana or narcotics for the management of her chronic health conditions." (Tr. 1729.) Plaintiff told Dr. Varan "narcotics were never terribly helpful for her in her opinion and she would rather continue marijuana at this point." (Tr. 1729; *but cf.* Tr. 1738, reporting on June 17, 2015, that Plaintiff's back pain "is impossible to treat without narcotics"). Dr. Varan noted that Kaiser would "not be planning further narcotic therapy for non-acute management of pain." (Tr. 1729.)

On February 6, 2014, Plaintiff visited the Providence Portland Medical Center Emergency Department, complaining of jaw pain. Plaintiff reported that she "sneezed this evening and subsequently dislocated her jaw." (Tr. 1119.) In his treatment note, Dr. Jackson Smood ("Dr. Smood") stated that Plaintiff "was sedated with intravenous propofol and her jaw dislocation easily reduced," and she was provided with a prescription for oxycodone. (Tr. 1120-21.)

On March 4, 2014, Plaintiff visited the Providence Portland Medical Center Emergency Department, complaining of jaw pain. Plaintiff reported that her jaw dislocated "when she sneezed" during an evaluation with her primary care physician at Providence Gateway. (Tr. 1305, 1307.) Dr. Ryan Brevard ("Dr. Brevard") noted that Plaintiff was sedated with propofol and "her jaw reduced without any manipulation for the most part," and that Plaintiff was "given IV Dilaudid to help her with discomfort." (Tr. 1307-08.) Dr. Brevard also noted that Plaintiff

complained that "her jaw was not reduced" immediately following the procedure, but she refused Dr. Brevard's request to obtain an x-ray, stating "'I'll just fucking go home and it'll just go back in [and] come out as it always does.'" (Tr. 1308.) Dr. Brevard found Plaintiff's response "perplex[ing]," which "raise[d] concern[s] that maybe [Plaintiff] is manipulating [her providers] and that [her jaw] wasn't dislocated." (Tr. 1308.) Dr. Brevard added that Plaintiff later apologized for her behavior and agreed to an x-ray, but "stated that she feels like her jaw went back into place spontaneously." (Tr. 1308.) The x-ray revealed "no obvious dislocation." (Tr. 1308.)

On March 17, 2014, Plaintiff visited the Providence Portland Medical Center Emergency Department, complaining of jaw pain. Plaintiff reported that she had a "nontraumatic dislocation [one] hour prior to arrival." (Tr. 1277.) Dr. Aaron Burchfield ("Dr. Burchfield") noted that he reviewed Plaintiff's medical records, that there was "a question of secondary gain," that "[c]linically [it was] questionable whether she had a dislocation," that an x-ray showed "a questionable dislocation/subluxation of the left," that Plaintiff was sedated and her jaw reduced, that Plaintiff "did request pain medication," and that Dr. Burchfield did not treat Plaintiff with pain medication because her physician "was reluctant to give [her] opioids[.]" (Tr. 1279.) Dr. Burchfield added that Plaintiff's "behavior is strongly suspicious for secondary gain/drug-seeking," and that Plaintiff provided an inaccurate report about following up with a "Dr. Bell." (Tr. 1279; *see also* Tr. 1308, stating that Dr. Bell works in an "oromaxillofacial surgery" department).

On April 10, 2014, Plaintiff underwent temporomandibular joint arthroplasty. (Tr. 1362, 1447.) In a Discharge Summary dated April 11, 2014, Dr. Michael Han ("Dr. Han"), a doctor of medical dentistry, stated that Plaintiff had been diagnosed with bilateral temporomandibular joint

"derangement and myofascial pain," underwent temporomandibular joint "disc repositioning and Botox injections," and was discharged in good condition. (Tr. 1447-48; *see also* Tr. 1463, "Operative intervention was deemed . . . to improve mandibular range of motion and overall function.").

In an Emergency Department note dated August 17, 2014, Dr. Rodney Thompson ("Dr. Thompson") stated that he "received a phone call from an outpatient pharmacy" about Plaintiff, that Plaintiff had received an oxycodone prescription on August 15, even though she informed Dr. Thompson the next day that she had "been taking only ibuprofen and Tylenol for pain," that Plaintiff "became quite upset and hostile" when Dr. Thompson "pointed out the frequency of her ER visits and concerns regarding narcotic usage" and "left a hostile message on the dry erase board," and that Dr. Thompson instructed the pharmacy to cancel "the hydrocodone prescription provided yesterday," given the "irregularities regarding" Plaintiff's "reporting of narcotic usage." (Tr. 1672.)

On January 4, 2015, Plaintiff visited the Providence Portland Medical Center Emergency Department, complaining of right shoulder and upper back pain. Plaintiff reported that "she was helping to move some heavy wood 2 and [a] half weeks ago" when "[s]omebody that was helping lift lost control and most weight went to [Plaintiff] causing pain in her right shoulder." (Tr. 1621.) Tracy Shultz ("Shultz"), a family nurse practitioner, noted that there were "no clinical signs of infection, deformity, or dislocation," that Plaintiff "has had multiple prescriptions through the Oregon prescription drug monitoring site," that Plaintiff's exam was consistent with "muscle strain," that Plaintiff was advised that Shultz "could give her some pain medication here," but Shultz "recommended she continue with ibuprofen at home," and that Plaintiff

responded by "elop[ing] from the department" without pain medication or discharge instructions. (Tr. 1623.)

On October 6, 2015, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 51-76.) Plaintiff testified that she has a General Equivalency Diploma, worked as a Certified Nursing Assistant as a teenager, lives with her husband and four children, injured her jaw in 2001 or 2002 while playing with her daughter, suffers from chronic jaw dislocations, first underwent jaw surgery "in early . . . 2002," and continues to experience pain when speaking, "shocks into the side of [her] face," and constant headaches. (Tr. 61-68.) Plaintiff also testified that she needs to use a power wheelchair "at times" because she ruptured "some of the tendons" and/or ligaments in her left foot in 2006, that she suffers from lower back pain that causes tingling and numbness in her legs after sitting for extended periods of time, that her carpal tunnel syndrome impacts her ability to get dressed, hold things, and use a computer, that she suffers from neuropathy and posttraumatic stress disorder, and that she uses medical marijuana to treat her pain because narcotics give her "really bad anxiety and mood swings." (Tr. 67-73.)

In a written decision issued on October 30, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 416.920(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25.

The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 19-31.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 30, 2013, the day she filed her application. (Tr. 21.) At step two, the ALJ found that Plaintiff had the following severe impairments: temporomandibular joint syndrome and chronic pain. (Tr. 21.) At step three, the ALJ concluded that Plaintiff did not

have an impairment that meets or equals a listed impairment. (Tr. 24.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work that involves no more than occasional climbing, kneeling, crouching, and crawling. (Tr. 24.) At step four, the ALJ found that Plaintiff has no past relevant work. (Tr. 30.) At step five, the ALJ found that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as an assembler of small components and ticket taker. (Tr. 31.)

## ANALYSIS

### I.      STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## II.    DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Plaintiff's testimony; (2) failing to provide germane reasons for discounting the lay testimony provided by Plaintiff's husband, Michael Adams ("Adams"); (3) failing to provide legally sufficient reasons for discounting the opinions of Plaintiff's treating physician, Dr. Linda Hungerford ("Dr. Hungerford"), and the non-examining medical expert, Dr. Levi Spence ("Dr. Spence"); (4) concluding, at step two of the sequential process, that temporomandibular joint syndrome and chronic pain were Plaintiff's only severe impairments; (5) concluding, at step three of the sequential process, that Plaintiff did not meet or equal a listed impairment; and (6) formulating an incomplete RFC and Vocational Expert ("VE") hypothetical. As explained below, the Court finds that the ALJ's decision is free of harmful legal error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's denial of benefits.

### A.    Plaintiff's Symptom Testimony

#### 1.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons

for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

## 2. Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce some of the symptoms alleged. (*See* Def.'s Br. at 2, acknowledging that there is no evidence of malingering, Tr. 25, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some symptoms[.]"). Accordingly, the ALJ was required to provide specific, clear, and convincing reasons for discrediting Plaintiff's subjective symptom testimony. The ALJ met that standard here.

First, the ALJ discounted Plaintiff's subjective symptom testimony on the ground that medical providers had raised "concerns . . . about medication misuse, which tends to render the claimant's allegations less than credible." (Tr. 28; *see also* Tr. 26-27, citing medical records noting, *inter alia*, Plaintiff's extensive use of narcotic pain pills, Plaintiff's drug screen was

positive for marijuana, the fact that "multiple providers had raised questions about excessive use of narcotics," and the fact that there was "a question of secondary gain"; *but cf.* Pl.'s Opening Br. at 17, arguing that the ALJ "offers no citation or support for the finding regarding medication misuse"). Medication misuse is a clear and convincing reason for discounting a claimant's testimony. *See Nacoste-Harris v. Colvin*, No. 14-1594-JO, 2015 WL 7012750, at *4 (D. Or. Nov. 12, 2015) ("Indications of medication misuse due to dependency may support an ALJ's adverse credibility determination." (citing *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001))); *Wright v. Colvin*, No. 11-0286, 2013 WL 1788493, at *7 (E.D. Wash. Apr. 26, 2013) (holding that the ALJ met the clear and convincing reasons standard and stating that the ALJ "had concerns with Plaintiff's use and misuse of narcotic medication which could have reasonably contributed to the finding that Plaintiff was not entirely credible," and noting that "[e]vidence of drug seeking behavior can . . . constitute a clear and convincing reason for discounting Plaintiff's testimony" (citing *Hart v. Astrue*, 349 F. App'x 175 (2009))); *see also Wallis v. Colvin*, 608 F. App'x 489, 489-90 (9th Cir. 2015) (holding that the claimant's "drug-seeking" behavior was a clear and convincing reason for discounting her testimony," and noting that precedential case law "suggest[s] that drug-seeking behavior undermines a claimant's credibility" (citing *Edlund*, 253 F.3d at 1157)).

Substantial evidence supports the ALJ's decision to discount Plaintiff's testimony on this ground. (*See* Tr. 918, "Given the fact that she is new to our system, she has already received several narcotic medications. I would be somewhat cognizant of the fact that she might be a narcotic seeker in the future," Tr. 1003, indicating that a treating doctor was "concerned" that Plaintiff's "complaints" are not consistent with "findings on exam," and stating that providers "must consider drug seeking behavior," Tr. 1721-22, noting that the OPDMP portal showed that

Plaintiff received "at least 586 tablets of narcotic pain pills alone (not including sedatives, etc.)" over the course of eleven months, that "[m]ultiple providers" had "raised question[s]" about Plaintiff's "excessive use of narcotics," and that Plaintiff's preliminary urine drug screen showed signs of THC, Tr. 1726, indicating that Plaintiff agreed to "stop using marijuana" after Dr. Varan noted that "DEA regulations specify [that] patients prescribed controlled substances such as narcotics should not use illegal drugs such as marijuana even in states with regulations permitting marijuana for medical use," Tr. 1279, noting that Plaintiff requested narcotic medication, that there was "a question of secondary gain," and that Plaintiff's primary care physician "was reluctant to give [her] opioids," Tr. 1672, noting that Dr. Thompson "received a phone call from an outpatient pharmacy" about Plaintiff, that Plaintiff provided Dr. Thompson with inaccurate information about her use of narcotic medications, that Plaintiff "became quite upset and hostile" when Dr. Thompson "pointed out the frequency of her ER visits and concerns regarding narcotic usage," and that Dr. Thompson instructed the pharmacy to cancel "the hydrocodone prescription provided yesterday," given the "irregularities regarding" Plaintiff's "reporting of narcotic usage," Tr. 1623, noting that Plaintiff "has had multiple prescriptions through the Oregon prescription drug monitoring site," and that Plaintiff "eloped from the [emergency] department" after the provider declined to provide any take-home narcotic pain medications).[2]

---

[2] The ALJ did not cite explicitly to all of the record evidence cited here, but it is nevertheless appropriate for the Court to consider additional support for grounds on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied." (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1005 n.3 (9th Cir. 2006))).

Second, the ALJ discounted Plaintiff's testimony based on conflicting objective medical evidence. (*See* Tr. 28, noting that "physicians have noted the lack of objective findings to support the claimant's allegations"; *see also* Tr. 26-27, citing medical records noting "largely unremarkable objective findings," a physician's statement that "it was clinically questionable whether [Plaintiff] had a dislocation based on imaging," even though Plaintiff complained of significant jaw pain, and a physician's statement that Plaintiff's "complaints were 'all over the place' and 'extremely frequent/variable,'" that "no assessment by any other physician, imaging, or bloodwork revealed 'any significant pathology to explain her pain,'" that "imaging had 'not shown any answers' and 'no doctors have found anything to explain [Plaintiff's] pain,'" and that the physician was "uncomfortable" filling pain prescriptions long-term based on the fact that there was "'no pathology and an ever-changing story about her source of pain'"; *but cf.* Pl.'s Opening Br. at 17, arguing that the ALJ "offers no citation or support for the finding regarding . . . physicians' notes of lack of objective findings"). It is well settled that "an ALJ may consider objective medical evidence as a factor 'in his credibility analysis.'" *Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)); *see also* *Watkins v. Comm'r Soc. Sec. Admin.*, 611 F. App'x 903, 904 (9th Cir. 2015) (holding that the ALJ provided clear and convincing reasons discounting the claimant's symptom testimony, and citing inconsistent medical evidence as one of those clear and convincing reasons).

Substantial evidence supports the ALJ's decision to discount Plaintiff's symptom testimony on this ground. (*See* Tr. 903-04, noting that Plaintiff complained primarily about lower back pain, Plaintiff exhibited full strength in her upper and lower extremities, and straight leg tests were negative, Tr. 910-11, noting that an MRI of Plaintiff's thoracic and lumbar spine

revealed "nothing more than mild disc issues and degenerative changes," and the etiology of Plaintiff's lower back pain and muscle spasms was "unclear," Tr. 918, noting that Plaintiff complained about right hip and groin pain, x-rays of Plaintiff's pelvis and right hip showed "no bony abnormalities," and Plaintiff was "able to do a straight leg raise," Tr. 992, stating that Plaintiff's x-rays were negative and her pulmonary exams were normal, and the reported "intensity" of Plaintiff's "pain is striking and difficult to explain," Tr. 1003, stating that a treating physician was "concerned" that Plaintiff's "complaints" are not consistent with "findings on exam," Tr. 1721-22, noting that Plaintiff reported suffering from Crohn's disease and lupus, but her records revealed that specialists were not able to confirm these diagnoses, Tr. 1305-08, noting that Plaintiff visited the emergency room complaining about a dislocated jaw, an x-ray revealed "no obvious dislocation," and the treating physician was concerned that Plaintiff is "manipulating" her providers, Tr. 1277-79, stating that Plaintiff complained about a dislocated jaw, an x-ray showed "a questionable dislocation/subluxation of the left," and "[c]linically [it was] questionable whether she had a dislocation," Tr. 1746-47, "After chart reviewing her outside records [predating June 23, 2015,] she has gone to internal medicine, family practice, emergency doctors, multiple of them over the last few years, with complaints ranging from chest pain, head pain, shoulder pain, neck pain, back pain, [and] jaw pain. When asking her how she has pain/injuries at seemingly different sites almost monthly requiring CTs/MRIs she got very upset and said 'it's just how my body works!' . . . None of her pain points to a specific diagnosis, her complaints are all over the place and extremely frequent/variable. No assessment by any other physicians [and] no imaging/bloodwork reveal any significant pathology to explain her pain. . . . I feel uncomfortable with refilling these [narcotic pain medications] long-term . . . with

the amount of diagnostics done and no pathology and an ever-changing story about her source of pain.").

Third, the ALJ discounted Plaintiff's symptom testimony on the ground that she engaged in activities that are "inconsistent with [her] allegations of debilitating symptoms and limitations." (Tr. 28.) "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support [an ALJ's subjective symptom analysis]." *Martin v. Colvin*, No. 3:14–cv–01603–SB, 2016 WL 890106, at *8 (D. Or. Feb. 9, 2016) (citation omitted); *see also Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, including the fact that the claimant's self-reported activities "were inconsistent with [the claimant's] estimation of her abilities"). In support of his finding, the ALJ observed that despite alleging disabling symptoms and limitations, Plaintiff reported being able to prepare simple meals, do "some light household chores and light gardening," care for pets, drive, "go out alone," shop in stores, read, play video games, watch television, use the computer, engage in social activities, attend church on a regular basis, care for "four children for the last 11 years," move "heavy wood," and chop wood. (Tr. 28.)

Plaintiff argues that the ALJ's reliance on her reported activities was misplaced. In support of her argument, Plaintiff asserts that "[t]here is no evidence in the record to suggest any inconsistencies between [her] modest daily activities and her claimed limitations," and she notes that she injured her shoulder after she chopped and carried heavy wood. (Pl.'s Opening Br. at 18.) The Court is not persuaded by Plaintiff's argument. Substantial evidence in the record supports the ALJ's decision to discount Plaintiff's testimony based on the inconsistency between her activities and her allegations of disabling symptoms and limitations. (*Compare* Tr. 40, 45,

indicating that Plaintiff appeared for an administrative hearing in a power chair and reported using the chair since approximately May 8, 2014, due to lower back and abdominal pain, Tr. 321-28, indicating that Plaintiff reported that her conditions make her "unable to perform the tasks that [are] needed for work," that Plaintiff's husband occasionally "has to help" Plaintiff put on her pants, shoes, and socks because "bending is very uncomfortable," that Plaintiff's husband has to help her "scrub[] her body" and "shave[] her legs, etc." that Plaintiff does "small/light loads of laundry but can't carry them all at once," that Plaintiff's pain "sometimes . . . hurts to[o] much to push on the brakes" of her car, and that Plaintiff cannot lift more than five to ten pounds because her back, hips, and knees cause "severe pain," *with* Tr. 909, indicating that Plaintiff reported that she "does yoga," Tr. 1017, "She has tried to exercise in the water and performs yoga exercises with yoga breathing and poses," Tr. 1073, "She feels that she has a good support system with going to church every week and [she] talks to friends and her pastor. She does tend to stay at home and isolate with being a homemaker and is very comfortable with that for the last 11 years," Tr. 1074, "Client has been a homemaker taking care of 3 step children and 1 daughter the last 11 years," Tr. 1077, noting that Plaintiff visits her pastor on a weekly basis and "has a circle of friends," Tr. 1621, noting that Plaintiff suffered a shoulder strain after moving "some heavy wood," because another individual reportedly "lost control" of the wood and Plaintiff was left bearing "most [of the] weight," and that Plaintiff "suffered a reinjury" about two-and-a-half weeks later when she was chopping "some wood," Tr. 1691, stating that Plaintiff enjoys being in her garden when it is nice outside); *see also Taylor v. Colvin*, 667 F. App'x 256, 257 (9th Cir. 2016) (affirming the ALJ's symptom analysis, which was based, in part, on the claimant's ability to care for her five children, and noting that the Ninth Circuit has affirmed an ALJ's rejection of a claimant's testimony where the claimant was "able to care for two small children, cook, keep

the house and do laundry, shop, and attend therapy and other meetings each week") (citation omitted).

Based on the foregoing, the Court declines to second-guess the ALJ's subjective symptom evaluation because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *see also Chesler v. Colvin*, 649 F. App'x 631, 632 (9th Cir. 2016) (holding that the ALJ provided two clear and convincing reasons for discounting a claimant's testimony, and thus concluding that, "[e]ven assuming that the ALJ erred in rejecting [the claimant's] symptom testimony for other reasons, any error was harmless" (citing *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004))); *Garza v. Astrue*, 380 F. App'x 672, 673-74 (9th Cir. 2010) ("The ALJ explicitly provided four reasons for rejecting Garza's testimony about the severity of her pain. We do not find three of the four reasons to be clear and convincing. Nevertheless, the ALJ also implicitly found that Garza's testimony conflicted with the medical record. Coupled with the lack of objective medical evidence, these contradictions amount to substantial evidence supporting the ALJ's determination, such that any error with regard to the other three reasons was harmless.") (citation omitted).

## B.  Lay Witness Testimony

### 1.  Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one

such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Further, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### 2.    Application of Law to Fact

Here, the ALJ assigned no weight to Adams' lay witness testimony because it was "inconsistent with the modest objective findings contained in the record." (Tr. 30.) This is a germane reason, supported by substantial evidence (*see supra* Part II.A.2., citing and discussing objective medical evidence that undermined Plaintiff's testimony) for discounting Adams' testimony. *See Bayliss*, 427 F.3d at 1218 ("Inconsistency with medical evidence is one such reason.") Plaintiff argues that the ALJ erred in discounting Adams' testimony on this ground, because the ALJ "overlooked numerous objective findings supporting" Adams' testimony. (Pl.'s Opening Br. at 15.) That does not change the fact that there are also numerous objective findings that undermine Adams' testimony. Under these circumstances, the ALJ's finding must be upheld. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

The ALJ also discounted Adams' testimony on the ground that it was "based in large part on the claimant's presentation and subjective reports, which are not fully credible." (Tr. 30.)

Plaintiff argues that the ALJ's finding is erroneous because Adams "has directly observed [Plaintiff's] longitudinal decline in functioning over 22 years" and "there is no indication that . . . Adams is relying on his wife's presentation and subjective reports." (Pl.'s Opening Br. at 15.) The Court is not persuaded by this argument. Adams' testimony focuses primarily on Plaintiff's self-reports of pain. (*See* Tr. 329-37, testifying that Plaintiff cannot stand for long periods of time or lift and carry things because she is weak and "her back, stomach, [and] feet hurt[]," "spends most of her day trying to stay out of pain," cares for her cat "to distract . . . from her pain," "wakes up most nights crying in pain," needs reminders "when the pain overcomes her," cannot "physically do hard work because of her pain," can shop for longer periods of time "if she rides a battery operated cart," and can only walk "between a block or 2" or a "few minutes" due to "severe pain"; *cf.* Tr. 322, indicating that Plaintiff testified that she "wake[s] up constantly from pain" and spends her "good days" sitting or lying down "about every 10 min[utes]" due to "back pain, leg pain, neck pain, spine pain, joint pain, etc."). Given Adams' heavy reliance on Plaintiff's self-reports of pain, it was reasonable for the ALJ to discount Adams' testimony on this ground. *See Wilder v. Comm'r Soc. Sec. Admin.*, 545 F. App'x 638, 639 (9th Cir. 2013) ("That [the lay witness] also relied in part on objective observations does not obviate her heavy reliance on [the claimant's] self reports."); (*see also* Tr. 1746-47, "[S]he has gone to internal medicine, family practice, emergency doctors, multiple of them over the last few years, with complaints ranging from chest pain, head pain, shoulder pain, neck pain, back pain, [and] jaw pain. . . . None of her pain points to a specific diagnosis, her complaints are all over the place and extremely frequent/variable. No assessment by any other physicians [and] no imaging/bloodwork reveal any significant pathology to explain her pain," Tr. 992, noting that Plaintiff's x-rays were negative and her pulmonary exams were normal, the reported "intensity" of Plaintiff's "pain is

striking and difficult to explain," and Plaintiff has shown "both unexpectedly intense pain from soft tissue injuries in the past as well as a strikingly poor response to strong narcotics," Tr. 1003, noting that a physician was "concerned" that Plaintiff's "complaints" are inconsistent with "findings on exam").

In sum, the ALJ provided germane reasons, supported by substantial evidence, for discounting Adams' testimony.

### C.     Medical Opinion Evidence

#### 1.     Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with

boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

## 2. Dr. Hungerford

Plaintiff argues that the ALJ failed to give specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Hungerford's opinion. (*See* Pl.'s Opening Br. at 10, acknowledging that the specific and legitimate reasons standard applies). As explained below, the Court disagrees.

Dr. Hungerford completed a medical source statement on May 6, 2015, at the request of Plaintiff's counsel. (Tr. 1101-05.) In her medical source statement, Dr. Hungerford stated, *inter alia*, that: (1) Plaintiff had appeared for her "2nd visit today," (2) Plaintiff suffers from depression, anxiety, and pain in her sacroiliac joints, lower back, hips, and abdomen, (3) Dr. Hungerford was "unable" to provide an opinion regarding Plaintiff's ability to lift, carry, sit, stand, walk, push, pull, climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, and feel without "a physical therapy evaluation," (4) Plaintiff's social functioning is extremely impaired, as reflected by "[p]ain on exam of [her] spine [and] abdomen [and] diminished grip strength," (5) Plaintiff's daily activities are markedly impaired due to limitations in reaching (including overhead) and grip strength, (6) Plaintiff's chronic pain and depression "make workplace stress impossible to manage," (7) "more than 80% of the workweek" Plaintiff's "attention and concentration would be impaired to such a degree" that she could not "perform even simple work tasks," (8) "2/3 of the workday" Plaintiff's pain, fatigue, shortness of breath, nausea, and nervousness would prevent her from performing simple tasks, and (9) Plaintiff's pain, anxiety, and depression would cause her to miss at least two days of work each month. (Tr. 1101-05.)

The ALJ assigned "little weight" to Dr. Hungerford's opinion and provided specific and legitimate reasons for doing so. First, and most notably, the ALJ found that Dr. Hungerford's opinions "are not consistent with the modest findings documented in the longitudinal record." (Tr. 29.) Inconsistency between a physician's opinion and the medical evidence is a specific and legitimate reason for discounting that opinion. *See Tommasetti*, 533 F.3d at 1041. Plaintiff argues that the objective medical evidence actually corroborates her pain complaints, and that the ALJ failed "to identify evidence of record contradicting" Dr. Hungerford's opinion. (Pl.'s Opening Br. at 9.)

As discussed above, substantial evidence supports the ALJ's determination that Plaintiff's complaints are undermined by the objective medical evidence. (*See, e.g.*, Tr. 1746-47, "After chart reviewing her outside records [predating June 23, 2015,] she has gone to internal medicine, family practice, emergency doctors, multiple of them over the last few years, with complaints ranging from chest pain, head pain, shoulder pain, neck pain, back pain, [and] jaw pain. . . . [S]he has pain/injuries at seemingly different sites almost monthly requiring CTs/MRIs[.] . . . None of her pain points to a specific diagnosis, her complaints are all over the place and extremely frequent/variable. No assessment by any other physicians [and] no imaging/bloodwork reveal any significant pathology to explain her pain."). In addition, and contrary to Plaintiff's argument, the ALJ properly evaluated Dr. Hungerford's opinion and provided record cites in support of his findings. (*See* Tr. 25-28, setting forth a thorough summary of the relevant evidence, stating his interpretations, making findings, and citing and describing unremarkable imaging and examinations, and instances where providers questioned whether Plaintiff's complaints and presentation were consistent with their examinations). Accordingly, the ALJ did not err in discounting Dr. Hungerford's opinion on this ground. *See Striped-Wolf v.*

*Colvin*, 590 F. App'x 677, 678 (9th Cir. 2015) (holding that the ALJ "properly evaluated" medical opinions "after setting out a detailed and thorough summary of the facts and conflicting evidence, stating her interpretation, and making findings," and after evaluating them in light of a legally sufficient reason for doing so); *Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (stating that a "reviewing court" is not deprived of its "faculties for drawing specific and legitimate inferences from the ALJ's opinion").

Second, the ALJ discounted Dr. Hungerford's opinion because she had seen Plaintiff "only twice at the time she completed the form, indicating that her responses were based *primarily* on [Plaintiff's] subjective reports." (Tr. 29) (emphasis added). Plaintiff argues that "there is no indication that Dr. Hungerford's findings were based *solely* on [her] subjective reports," and notes that Dr. Hungerford's opinion "referenced medical records, physical examination, and chart notes in her opinion." (Pl.'s Opening Br. at 9) (emphasis added). As an initial matter, the ALJ did not state that Dr. Hungerford's opinion was based *solely* on Plaintiff's self-reports. Even if that were the case, however, the brevity of patient-physician relationship alone was a legally sufficient ground for discounting Dr. Hungerford's opinion. *See Pigula v. Berryhill*, ---- F. App'x ---- , 2018 WL 1465457, at *1 (9th Cir. Mar. 26, 2018) (citing "the short duration of one doctor's treatment relationship" with the claimant as a specific and legitimate reason for assigning "less weight" to the doctor's opinion); *Lee v. Berryhill*, ---- F. App'x ----, 2017 WL 6629018, at *2 (9th Cir. Dec. 29, 2017) (holding that the ALJ provided specific and legitimate reasons for discounting the opinion of a treating physician who determined that the claimant was completely disabled "after a single appointment," and noting that "the brevity of

the patient-physician relationship" justified rejecting the physician's opinion); (*see also* Pl.'s Opening Br. at 8, explaining that "opinions from all medical sources are to be evaluated based on factors such as how long the [medical] source has known and how frequently the source has seen the individual"). Accordingly, the ALJ did not err in discounting Dr. Hungerford's opinion on this ground.

Third, the ALJ discounted Dr. Hungerford's opinion because Plaintiff's "activities indicate greater functioning than alleged." (Tr. 29.) As discussed, substantial evidence supports the ALJ's finding that Plaintiff's reported activities are inconsistent with her complaints of disabling symptoms and limitations. *See supra* Part II.A.2. Accordingly, the ALJ did not err in discounting Dr. Hungerford's opinion on this ground. *See Dubois v. Colvin*, 649 F. App'x 439, 441-42 (9th Cir. 2016) (holding that the ALJ met specific and legitimate reasons standard, and noting that the ALJ found the medical opinions "inconsistent with [the claimant's] reported activities").

For these reasons, the Court concludes that the ALJ provided specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Hungerford's opinion. Thus, any error in the ALJ's additional reasons for discounting Dr. Hungerford's opinion was harmless. *See Bailey v. Colvin*, 659 F. App'x 413, 415 (9th Cir. 2016) (holding that the ALJ provided two specific and legitimate reasons for rejecting the claimant's treating physician's opinions and, therefore, concluding that "[a]ny error in the ALJ's additional reasons for rejecting [the treating physician's] opinions was harmless" (citing *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015))).

### 3.    Dr. Spence

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for discounting the opinion of the non-examining medical expert, Dr. Spence. Specifically, Plaintiff argues that

the ALJ erred in discounting Dr. Spence's opinion that Plaintiff is presumptively disabled under listing 1.08. (*See* Pl.'s Opening Br. at 11-12, 14, noting that Dr. Spence opined that Plaintiff's temporomandibular joint syndrome "equals listing 1.08," arguing that it is "readily apparent" that Plaintiff is disabled when Dr. Spence's opinion is "properly considered," and arguing that Plaintiff met her burden at step three of the sequential evaluation process based on Dr. Spence's opinion).

Before addressing the merits of Plaintiff's argument, the Court briefly summarizes the testimony provided by the two medical experts who appeared at Plaintiff's administrative hearings. Dr. Howard Shapiro ("Dr. Shapiro") testified at Plaintiff's first administrative hearing, which was held on May 8, 2015. (Tr. 40.) During that hearing, Exhibits 1A through 15F (pages 77-1105 of the transcript, *see* Ct. Tr. Index at 1-3) were admitted into evidence. (Tr. 41.) These exhibits included images of Plaintiff's temporomandibular joints ("TMJ") that were taken in March, April, and October 2013 (i.e., images that postdate the protective filing date). (*See also* Tr. 26, citing Exhibit 9F in noting that "x-rays performed in March 2013 showed no obvious dislocation of the right TMJ and some possible arthritis of the left TMJ," and citing Exhibit 12F in noting that an "MRI of the TMJ performed in October 2013 showed fixed anterior displacement of the left articulating disc in both the open and closed mouth positions, and suspected degenerative tearing of the right articular disc and associated subchondral cystic changes of the mandibular condyle"; *see also* Tr. 923-24, 927, 1067-71, setting forth the relevant images of Plaintiff's TMJ from March 15, 2013, April 5, 2013, and October 7, October 19, and October 24, 2013). Based on his review of these exhibits, Dr. Shapiro found that Plaintiff did not meet or equal any of the listed impairments. (*See* Tr. 46, testifying that Plaintiff "does not equal or meet any of the listings in the Social Security Administration Adult Listings"). Dr. Shapiro

also testified that the record evidence presents "a question of confabulation," and that there is "considerable difference" between Plaintiff's "statements" and the objective medical evidence. (Tr. 44, 46.)

On October 6, 2015, the ALJ convened a second administrative hearing because Plaintiff failed timely to provide the ALJ and Dr. Shapiro with approximately 600 pages of medical records. (Tr. 42, 47-48, 52.) Dr. Spence appeared as the expert at the second hearing, and Exhibits 1A through 15F and Exhibits 16F through 22F (pages 1106-1788 of the transcript, *see* Ct. Tr. Index at 3-4) were admitted into evidence. (Tr. 52.) Exhibits 16F through 22F include, *inter alia*, records documenting Plaintiff's April 2014 TMJ arthroplasty and her frequent trips to the emergency room due to reported jaw pain and dislocations. Based on his review of the foregoing exhibits, Dr. Spence testified that Plaintiff's TMJ condition reportedly stems from a "severe blow" suffered in or around 2001, imaging, in particular those "described at 12F," showed that Plaintiff "had developed degenerative changes in the actual TMJ joints," he did "not have a report as to whether the condition has improved or not" following surgery and injections, and Plaintiff "does equal [listing] 1.08" based primarily on "the limitation on mastication because of displacement of the jaw," as well as her "constant pain" and "frequent dislocations, requiring almost an ongoing, at least in part, surgical treatment." (Tr. 55-56, 60.) Dr. Spence also described Dr. Shapiro's finding of "confabulation in the record" as "quite correct." (Tr. 56.)

An ALJ may reject the opinion of a non-examining medical expert, such as Dr. Spence, by referring to "specific evidence in the medical record." *See Hanson v. Colvin*, No. 3:15-cv-01974-JE, 2017 WL 2432159, at *4 (D. Or. May 2, 2017) ("As stated by Plaintiff, the ALJ may reject the opinion of a non-examining medical expert by reference to specific evidence in the

medical record." (citing *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998))); (Def.'s Br. at 9, citing *Sousa* for the same proposition). The Court finds that the ALJ met that standard here.

The ALJ assigned "little weight" to Dr. Spence's opinion because Dr. Shapiro offered a conflicting opinion regarding whether Plaintiff met or equaled a listed impairment, and because the ALJ found Dr. Shapiro's opinion "more consistent with the record considered as a whole." (Tr. 24.) Plaintiff argues that the ALJ erred in crediting Dr. Shapiro's opinion over Dr. Spence, and emphasizes that Dr. Shapiro's opinion was based "on an incomplete" record review. (Pl.'s Opening Br. at 11.) Pointing to, *inter alia*, the results of her October 2013 MRIs and her frequent trips to the emergency room, Plaintiff argues that the ALJ has "grossly mischaracterized" the severity of her TMJ syndrome. (Pl.'s Opening Br. at 11.) The Court is not persuaded by these arguments.

The ALJ was charged with determining credibility and resolving the conflict between Dr. Spence's and Dr. Shapiro's opinions. *See McLaughlin v. Colvin*, No. 12-cv-01608, 2013 WL 4208764, at *3-4 (C.D. Cal. Aug. 14, 2013) (noting that when "'the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict'" (quoting *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003))). It was reasonable for the ALJ to credit Dr. Shapiro's opinion over Dr. Spence. That is especially true when you consider that: (1) Dr. Shapiro was able to review Plaintiff's October 2013 MRIs, which were taken shortly before she underwent TMJ arthroplasty; (2) in arguing that Dr. Spence's opinion should have been credited over Dr. Shapiro's, Plaintiff places considerable emphasis on her self-reports, which have been properly discounted as not credible; and (3) many of the records that Dr. Shapiro was not able to review support his opinion and undermine Plaintiff's self-reports regarding her TMJ syndrome, which supports the ALJ's finding that Dr. Shapiro's opinion is

more consistent with the record as a whole. (*See* Tr. 1305-08, noting that Plaintiff visited the emergency room on March 4, 2014, complaining of jaw pain and reporting that it dislocated "when she sneezed," Plaintiff's "jaw reduced without any manipulation for the most part," even though Plaintiff complained that "her jaw was not reduced," an x-ray later revealed "no obvious dislocation," and Dr. Brevard found Plaintiff's behavior "perplex[ing]," which "raise[d] concern[s] that maybe [Plaintiff] is manipulating [her providers] and that [her jaw] wasn't dislocated," Tr. 1277-79, stating that Plaintiff visited the emergency room on March 17, 2014, complaining of jaw pain due to a reported dislocation, that Dr. Burchfield reviewed Plaintiff's medical records, that Dr. Burchfield believed that there was "a question of secondary gain" and that "[c]linically [it was] questionable whether she had a dislocation," that an x-ray showed "a questionable dislocation/subluxation of the left," that Plaintiff was sedated and her jaw reduced, and that Dr. Burchfield refused Plaintiff's request for pain medication, Tr. 1463, observing that Plaintiff's April 2014 TMJ arthroplasty "was deemed . . . to improve [Plaintiff's] mandibular range of motion and overall function," Tr. 1721-22, noting that Plaintiff visited Dr. Eschbach on November 21, 2013, complaining of a "dislocated left mandible," Plaintiff received "at least 586 tablets of narcotic pain pills alone (not including sedatives, etc.) since 1/13," "[m]ultiple providers" had "raised question[s]" about Plaintiff's "excessive use of narcotics," Plaintiff's mandible "reduce[d] spontaneously without manipulation" when "she relaxed," Plaintiff said she did "not want narcotics," but was "angry" when Dr. Eschbach offered her Tylenol, and Plaintiff and her husband "stormed out" when Dr. Eschbach stated that Plaintiff's urine drug screen showed signs of THC).

The ALJ also discounted Dr. Spence's opinion based on other conflicting objective medical evidence. (*See* Tr. 24, "As discussed further below, workup in the early 2000s [i.e.,

around the time when the original injury occurred] showed normal x-rays and primarily a pain condition"; Tr. 25-27, discussing the injury that occurred to Plaintiff's jaw in April 2001, and describing additional objective evidence that undermined Plaintiff's self-reports regarding her TMJ syndrome, such as a 2001 "CT scan" that showed only "a degree of subluxation of the left TMJ," 2001 x-rays that "showed no evidence of fracture or dislocation," images from 2003 that "did not reveal any dislocation," the March 2013 and October 2013 images that Dr. Shapiro reviewed and determined failed to support a finding that Plaintiff met or equaled listing severity, a March 2014 x-ray that "did not show any obvious dislocation," March 2014 treatment notes raising "a question of secondary gain" and noting that it was clinically questionable whether a dislocation occurred, and a June 2014 treatment note stating that there "was nothing to suggest dislocation clinically").

In light of the foregoing, the Court finds that the ALJ did not err in rejecting Dr. Spence's opinion in favor of Dr. Shapiro's, because the ALJ did so based on "specific evidence in the medical record." *See Dunn v. Berryhill*, No. 16-5802, 2017 WL 2536970, at *3 (W.D. Wash. May 25, 2017) ("Inconsistency with the record is a legally sufficient reason to discount the opinion of a non-examining source."); *Latsha v. Astrue*, No. 10-668, 2011 WL 3476852, at *4 (C.D. Cal. Aug. 9, 2011) ("Dr. Pierce's opinion is 'specific evidence in the medical record' supporting the ALJ's decision to reject Dr. Mallare's opinion. As such, the ALJ did not err here.") (citation omitted).[3]

///

---

[3] Plaintiff's argument that the ALJ erred at step three is dependent upon her argument that the ALJ erred in discounting Dr. Spence's opinion. (*See* Pl.'s Opening Br. at 14, requesting that Plaintiff be found disabled under listing 1.08 "based on the above opinion of Dr. Spence," and reiterating that "[a]s noted above, the ALJ improperly rejected Dr. Spence's opinion"). Based on the analysis above, the Court rejects Plaintiff's argument that she is presumptively disabled.

### D.       The ALJ's Step Two Severity Findings

Finally, Plaintiff argues that the ALJ erred at step two by not finding that "several" of her impairments (i.e., chronic gastrointestinal illness, sciatica, posttraumatic stress disorder, depression, anxiety, neuropathic pain, "status post hysterectomy/uterine cancer for endometriosis," and "status post carpal tunnel surgery") were severe. (Pl.'s Opening Br. at 13.) The Commissioner argues that Plaintiff has failed to "articulate any valid challenge to the ALJ's findings at step two," because she failed to "rebut the actual reasoning in the ALJ's decision" and "does not articulate any arguments as to how the ALJ might have erred." (Def.'s Br. at 11.) The Commissioner also argues that Plaintiff has waived any further developed argument. (Def.'s Br. at 11.)

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. To meet her burden of demonstrating harmful error, Plaintiff must explain what limitations were erroneously omitted from her RFC due to the ALJ's alleged error at step two. *See, e.g.*, *Eriksen v. Colvin*, No. 15-00159-PK, 2016 WL 3961712, at *4 (D. Or. July 22, 2016) (noting that the claimant argued that the ALJ erred at step two and that the ALJ resolved step two in the claimant's favor, and holding that the alleged error at step two was harmless because the claimant failed to "point to any limitations erroneously omitted from the RFC" as the result of the alleged error (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007))).

In this case, as in *Eriksen*, step two was resolved in Plaintiff's favor and she failed to point to any specific limitations that were omitted from her RFC as the result of the ALJ's alleged error at step two. (*See* Pl.'s Reply at 4, acknowledging the Commissioner's argument that "Plaintiff failed to show any error in the ALJ's findings," claiming that "the Commissioner is incorrect," asserting generally that the "improper rejection of severe impairments . . . resulted in

an erroneous RFC," the "ALJ failed to properly account for numerous physical and mental impairments, resulting in additional limitations to Ms. Miracle-Adams, preventing her from maintaining employment on a regular and continuous basis," the "improperly rejected, or ignored, impairments give support to the medical source statements the ALJ improperly rejected," and thus stating "this was harmful error"). Accordingly, Plaintiff has failed to meet her burden of demonstrating harmful error at step two. (*See also* Tr. 21-24, indicating that the ALJ addressed Plaintiff's right flank pain, kidney stones, recurrent urinary tract infections, asthma, lupus, Crohn's disease, carpal tunnel syndrome, mild degenerative disc disease, and mental impairments at step two and found they were not severe impairments, and that the ALJ made a number of findings and cited objective medical evidence in support of his severity determinations).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

**IT IS SO ORDERED.**

DATED this 9th day of April, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge